AMERICAN EXPRESS COMPANY, demandante y recurrida, *v.* MUNICIPIO DE SAN JUAN, ETC., demandados y recurrentes.

*Número:* R-85-237      *Resuelto:* 19 de enero de 1988

340

*José A. Menéndez Cortada*, de *Martínez Álvarez, Fernández Paoli, Menéndez Monroig, Menéndez Cortada & Lefranc Romero*, abogado de los recurrentes; *Fred H. Martínez* y *Juan Ramón Cancio*, de *Martínez, Odell, Calabria y Sierra*, abogados de la recurrida; *Carmen Enid Rodríguez Pardo*, abogada del Departamento de Hacienda que comparece en calidad de *amicus curiae*; *Raúl Acevedo Rodríguez*, abogado de la Cámara de Comercio.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

A solicitud del Municipio de San Juan revisamos la sentencia dictada por el Tribunal Superior, revocatoria de una decisión del Director de Finanzas de dicho municipio, en la cual se le impuso a American Express la obligación de pagar las correspondientes patentes municipales. Luego de analizada la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651 *et seq.*, revocamos al tribunal de instancia. Concluimos que al amparo de dicho estatuto el servicio de tarjetas que ofrece American Express es un "negocio financiero" sujeto a las disposiciones de la mencionada ley.

I

El Municipio de San Juan, en virtud de los poderes que le confiere la nueva Ley de Patentes Municipales, Ley Núm. 113 de 10 de julio de 1974 (21 L.P.R.A. sec. 651 *et seq.*), le notificó a la demandante recurrida American Express Company una deficiencia en el pago de sus patentes por la suma de $151,291.87. Fundó su determinación en las Secs. 2(a)(5) y 5 de la Ley de Patentes Municipales que definen y regulan

las patentes a pagarse por los "negocios financieros".(1) 21 L.P.R.A. secs. 651a(a)(5) y 651d. American Express solicitó reconsideración del municipio, pues entendía que su actividad en Puerto Rico no constituía un "negocio financiero" según definido por el ordenamiento aplicable. El 16 de enero de 1984 el Municipio emitió una determinación final en la cual sostuvo su dictamen inicial.

Con el propósito de impugnar esta determinación, American Express presentó demanda acompañada de fianza a favor del municipio por la suma de $175,000. El Tribunal Superior la declaró con lugar y anuló la deficiencia notificada. Su determinación se fundó principalmente en que American Express no cobra intereses por los cargos en que incurren los usuarios de su tarjeta. El Municipio acudió ante nos en solicitud de revisión y, por la naturaleza e importancia de la controversia, expedimos el auto e invitamos al Departamento de Hacienda, a la Cámara de Comercio y a la Asociación de Bancos a comparecer como *amicus curiae*.(2)

## II

La Constitución del Estado Libre Asociado de Puerto Rico concede facultad a la Asamblea Legislativa para

---

(1) Los negocios financieros pagan una patente igual al 1.00% de su volumen de negocios. Los demás negocios pagan 0.30% de su volumen de negocios. 21 L.P.R.A. sec. 651d.

(2) En la resolución de 17 de octubre de 1985 indicamos que el Tribunal estaba interesado en que estas entidades examinaran "la relación contractual entre la demandante-recurrida y los establecimientos comerciales, incluyendo, entre otras, las comisiones y descuentos, el funcionamiento de las tarjetas de crédito, débito y otro tipo emitido por los bancos, tiendas por departamentos y otras empresas, la estructura corporativa utilizada en el sistema de tarjetas de crédit[o] y otros depósitos, la determinación de qué es un negocio financiero en nuestra economía moderna y cualquier otra información y extremos pertinentes".

Oportunamente, el Departamento de Hacienda sometió un informe abarcador sobre el asunto planteado. La Cámara de Comercio, mediante moción explicativa, solicitó se le relevara de participar como *amicus curiae*. La Asociación de Bancos no compareció.

"crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo a su régimen y función . . .". Art. VI, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 362. Véase *Colón* v. *Municipio de Guayama*, 114 D.P.R. 193 (1983). Al amparo de este poder, la Asamblea Legislativa, mediante la Ley Orgánica de los Municipios, 21 L.P.R.A. sec. 2001 *et seq.*, creó las entidades jurídicas y políticas conocidas como municipios y dispuso lo relativo a su estructura, facultades, deberes y funciones.

Aunque los municipios no tienen una facultad inherente de imponer contribuciones, entre las facultades, poderes y funciones que les confiere la Asamblea Legislativa de Puerto Rico se encuentran las de imponer una contribución básica sobre el valor tasado de la propiedad mueble e inmueble, así como contribuciones adicionales especiales para el pago de empréstitos o para mejora pública en beneficio directo de la sección urbana o rural sujeta a contribución. Además, los municipios tienen poder para imponer y cobrar contribuciones, derechos, arbitrios e impuestos razonables dentro de sus límites territoriales y sobre materias no incompatibles con la tributación impuesta por el Estado. Art. 2.04(24), (25), (26) y (27) de la Ley Orgánica de los Municipios, 21 L.P.R.A. sec. 2054(24), (25), (26) y (27).[3] Ahora bien, como su poder es delegado por la Asamblea Legislativa, 'como regla general, debe ejercitarse dentro de los límites específicos de la autoridad conferida. E. McQuillin, *The Law of Municipal Corporations*, 3ra ed. rev., Illinois, Callaghan and Co., 1986, Vol. 16, Sec. 44.17.

---

[3] Véanse, además, los incisos (4), (12), (29) y (30) del Art. 2.04 de la Ley Orgánica de los Municipios, 21 L.P.R.A. sec. 2054(4), (12), (29), (30), y el Art. 4.18(5) de ésta, 21 L.P.R.A. sec. 3068(5).

■ La Ley Núm. 113 de 10 de julio de 1974 (21 L.P.R.A. sec. 651 *et seq.*) (en adelante, Ley de Patentes Municipales) autorizó a las Asambleas Municipales a imponer y cobrar patentes a los tipos que en ella se prescriben, al disponer que "[e]l producto de las mismas [patentes] se usará para cubrir las atenciones de sus presupuestos". 21 L.P.R.A. sec. 651b. Véanse: McQuillin, *op. cit.*, Vol. 9, Sec. 26.15–26.16; E. Córdova, *Curso de Gobierno Municipal*, Río Piedras, Ed. Universitaria, 1964, pág. 353. Esa patente obligatoria, aunque adopta la forma de un permiso o licencia para el ejercicio de una actividad económica, realmente constituye un impuesto que va a variar de acuerdo al volumen de negocio de la empresa tributada. *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416 (1964).

■ Si bien en otras jurisdicciones se favorece una interpretación restrictiva del poder tributario de los municipios, C.J. Antieau, *Municipal Corporation Law*, Nueva York, Ed. Matthew Bender, 1979, Vol. 2A, Sec. 21.02; McQuillin, *op cit.*, Sec. 44.13, en Puerto Rico la Asamblea Legislativa, al amparo del Art. VI, Sec. 1 de la Constitución del E.L.A., *supra*, delegó esa autoridad fiscal con la clara intención de "ampliar el número de industrias o negocios con fines de lucro sujetos a tributación". Informe de la Comisión de Hacienda de la Cámara de Representantes de 20 de junio de 1974, pág. 2. Véase, también, Córdova, *op. cit.*, págs. 283 *et seq.*

■ Como consecuencia del crecimiento vertiginoso de las ciudades y, por ende, de los servicios municipales, la ley de patentes evolucionó rápidamente. La legislación vigente tiene su origen en la Ley de Patentes aprobada en 1914, la que enumeraba en forma taxativa los negocios sujetos a tributación. 1914 Leyes de Puerto Rico 142. En el 1931 se aprobó otra ley que facultó a los municipios a clasificar e incluir empresas comerciales e industriales. 1931 Leyes de

Puerto Rico 565. Véanse: *Cervecería India* v. *Municipio*, 77
D.P.R. 100 (1954); *Zerbe Penn* v. *Gob. de la Capital*, 86
D.P.R. 618 (1962); *Mun. de San Juan* v. *P.R. Coal Co.*, 28
D.P.R. 263 (1920); *Texas Co. (P.R.), Inc.* v. *Municipio*, 81
D.P.R. 499 (1959); *Yabucoa Sugar Co.* v. *Municipio*, 44
D.P.R. 348 (1933). Finalmente, en el 1974 la Asamblea Legis-
lativa concedió una facultad general a los ayuntamientos
para imponer y cobrar patentes a diversas clases de negocios
definidos por ley. 21 L.P.R.A. sec. 651.

Esta ley responde a una filosofía que favorece ampliar los
poderes de los municipios, de manera que éstos puedan pro-
veer más servicios directos a la ciudadanía. En *Molinos de
P.R.* v. *Municipio de Guaynabo*, 105 D.P.R. 470, 474 (1976),
resumimos la evolución del derecho puertorriqueño sobre
patentes municipales:

> Durante los últimos años ha habido una corriente de pensa-
> miento, no exclusiva desde luego, que favorece la ampliación
> de la facultad impositiva de los municipios. De ahí surge esta
> tendencia que favorece la ampliación de las facultades imposi-
> tivas de los municipios. Naturalmente, este es un problema
> complejo de política pública lleno de concomitancias y corres-
> ponde a la Asamblea Legislativa y no al Poder Judicial tomar
> las decisiones que estime pertinentes. Sin embargo, como di-
> jimos en *Texas Co. (P.R.)[, Inc.]* v. *Municipio*, 81 D.P.R. 499,
> 509 (1959), no estamos justificados en adoptar normas restric-
> tivas "en contra del poder contributivo de los municipios, a la
> luz de las claras e inequívocas expresiones que de tiempo en
> tiempo ha venido haciendo la Asamblea Legislativa con el fin
> de fortalecer, antes que debilitar, la facultad contributiva de
> los gobiernos municipales concedida en la Ley de Patentes."
> Cuando hay autoridad de ley para ello y excepto en casos inhe-
> rentemente sospechosos no estamos inclinados a intervenir
> con la regulación económica municipal, pues como hemos se-
> ñalado, esta es una función primordialmente legislativa, *City
> of New Orleans* v. *Dukes*, 49 L.Ed.2d 511 (1976). (Escolio omi-
> tido.)

■ Recientemente, en *Arecibo Bldg. Corp.* v. *Mun. de Arecibo*, 115 D.P.R. 76, 78 (1984), reafirmamos lo expresado en *Molinos de P.R.* v. *Municipio de Guaynabo*, supra, y añadimos que:

> La Sec. 3 de la Ley de Patentes de 1974 (21 L.P.R.A. sec. 651b) autoriza a las Asambleas Municipales de todos los municipios a imponer y a cobrar patentes "a toda persona dedicada a la prestación de cualquier servicio, o a la venta de cualquier bien, negocio financiero y/o cualquier industria o negocio . . . ". Del texto de la ley se desprende que la autoridad concedida a los municipios es *amplia*. La utilización de las palabras "toda persona", "cualquier servicio", "cualquier industria o negocio" no permiten que se le dé una interpretación restrictiva . . . . (Énfasis suplido.)˙

■ La Ley de Patentes Municipales de 1974 autoriza a los municipios del Estado Libre Asociado de Puerto Rico a imponer y cobrar patentes municipales a toda persona dedicada a "la prestación de cualquier servicio, o a la venta de cualquier bien, negocio financiero y/o cualquier industria o negocio . . . ". 21 L.P.R.A. sec. 651b. Toda persona dedicada "con fines de lucro a la prestación de cualquier servicio, a la venta de cualquier bien, *a cualquier negocio financiero o a cualquier industria o negocio*" está sujeta a la imposición de este tributo. (Énfasis suplido.) 21 L.P.R.A. sec. 651c. La ley también dispone que la patente aplicable a los negocios financieros no "podrá exceder de (1.00%) de su volumen de negocios atribuibles al municipio que imponga la patente autorizada". 21 L.P.R.A. sec. 651d. Por último, la Sec. 2(a)(5) de la Ley de Patentes Municipales define un negocio financiero de la forma siguiente:

> El término "negocio financiero" significa toda industria o negocio consistente en servicios y transacciones de bancos comerciales, asociaciones de ahorro y préstamos, bancos mutualistas o de ahorros, compañías de financiamiento, compañías

de seguro, compañías de inversión, agencias de cobro y de cualquier *otra actividad financiera* llevada a cabo por cualquier industria o negocio. (Énfasis suplido.) 21 L.P.R.A. sec. 651a(a)(5).[4]

■ De conformidad con dicho estatuto, cualquier persona que se dedique a un negocio financiero está sujeta al pago de patentes a la tasa máxima de 1.00% con una base contributiva distinta. 21 L.P.R.A. sec. 651d(a). Al amparo de esta sección se extendió el alcance de la patente a toda industria o negocio que se dedique a ofrecer servicios y transacciones bancarias y se incluyeron las operaciones de las "compañías de financiamiento, compañías de seguro, compañías de inversión, [y las] agencias de cobro . . . ". Sec. 2(a)(5) de la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651a(a)(5).

■ La ley no limita la aplicación de la patente a las empresas específicamente identificadas. Todo lo contrario, al extender la patente a cualquier otra actividad financiera la Legislatura delegó a los municipios el poder de cobrar este impuesto a empresas destinadas a actividades financieras. También se autorizó a los municipios a cobrar patentes a cualquier otra empresa dedicada a una actividad financiera. Dichas actividades pueden ser iguales a las realizadas por las entidades enumeradas o pueden incluir otra operación de naturaleza financiera.

---

[4] En su comparecencia, American Express alega que al interpretar el término "negocio financiero" debemos aplicar la norma de interpretación de estatutos conocida como *ejusdem generis*. Según esta regla, "cuando palabras generales siguen después de palabras específicas en una enumeración descriptiva del sujeto legal, las palabras generales se interpretan en el sentido de sólo comprender objetos similares de la naturaleza de aquellas enumeradas por las palabras específicas precedentes". *Puerto Rico Ilustrado v. Buscaglia*, 64 D.P.R. 914, 922 (1945). Véase C.J. Antieau, *Municipal Corporation Law*, Nueva York, Ed. Matthew Bender, 1980, Vol. 2A, Sec. 21.03. Sin embargo, aun si aplicáramos dicha regla de hermenéutica, el resultado sería igual.

Finalmente, la ley delegó en los municipios el poder de imponer patentes a las personas que se dediquen a distintas industrias o negocios a base "del volumen de negocios de cada industria o negocio y al tipo prescrito" para cada uno. 21 L.P.R.A. sec. 651e. De esta manera se reconoce que algunas empresas llevan a cabo diversos negocios sujetos a distintos tipos de patente. Lo determinante es que esa actividad de por sí constituya un negocio de esa persona y que, de llevarse a cabo separadamente, hubiese pagado patentes por constituir una actividad lucrativa no exenta. 21 L.P.R.A. sec. 651h. Entre los criterios que deben ser examinados al amparo de esta sección se incluyen: (a) la naturaleza y los propósitos de la industria o negocio correspondiente; (b) su relación con las otras operaciones de la empresa; (c) la finalidad de los servicios y transacciones ofrecidos; (d) el número de personas empleadas y la estructura utilizada por la persona para llevar a cabo dicha gestión empresarial, y (e) los ingresos brutos recibidos o devengados de una actividad empresarial.

Nos corresponde, entonces, resolver si American Express es una industria o negocio que se dedica principalmente a una actividad financiera mediante su servicio de tarjetas y, por lo tanto, si está sujeta al tipo de patente aplicable a esas operaciones.(5)

### III

La tarjeta de crédito es un instrumento moderno de financiamiento de amplio arraigo en nuestra vida económica que ha revolucionado el financiamiento de bienes al consumi-

---

(5) El hecho de que, al amparo de otra legislación, no pudiera clasificarse a la recurrida como institución financiera no es impedimento para concluir que se dedica a una actividad financiera al amparo de la Ley de Patentes Municipales.

dor, al facilitar un método de crédito aceptable en numerosos establecimientos a través de todo el mundo. En Puerto Rico, aunque no existen datos completos, se estima que hay más de un millón de tarjetas emitidas por tiendas por departamentos, bancos y otras entidades. Carrión, Testimonio de la Asociación de Bancos de Puerto Rico sobre el Uso de Tarjetas de Crédito en Puerto Rico y el Impacto que Éste Pueda Tener en el Pueblo Consumidor, ante la Honorable Comisión de Asuntos al Consumidor del Senado de Puerto Rico de 10 de diciembre de 1986. Las cuentas rotativas y de plazos diferidos, mayormente representadas por la figura de la tarjeta de crédito, constituyen una de las principales fuentes de crédito en Puerto Rico con un valor total de $216 millones al finalizar el año fiscal 1984. Informe Económico al Gobernador, Junta de Planificación, 1983–1984, T. II, pág. X-12.

La tarjeta de crédito moderna tiene muchas modalidades. Anteriormente, en *Santiago v. Sears Roebuck*, 102 D.P.R. 515, 522 (1974), examinamos extensamente este instrumento de crédito y reconocimos que en cualquiera de sus formas "constituye un contrato en el derecho de Puerto Rico y se ha designado así expresamente por nuestra Asamblea Legislativa". Esta figura contractual de naturaleza atípica, conocida comúnmente como "contrato de apertura de crédito", crea una relación compleja entre el usuario y la institución que origina las tarjetas. Sus contornos fueron definidos posteriormente por este Tribunal en *Banco de Ponce v. D.A.C.O.*, 114 D.P.R. 92 (1983), al examinar únicamente la aplicación de la Ley de Ventas a Plazo y Financiamiento, 10 L.P.R.A. sec. 731 *et seq.*, a la cuota anual cobrada por una entidad bancaria una vez se expide una tarjeta de crédito. El término "cargo por financiamiento" de la Ley de Ventas a Plazo y Financiamiento que allí examinamos, no es sinónimo del concepto de "actividad financiera" que hoy nos corres-

ponde analizar al amparo de la Ley de Patentes Municipales, 21 L.P.R.A sec. 651 *et seq.* En este caso la controversia es más complicada. Requiere que, sin penetrar las distintas entidades corporativas, examinemos la compleja, sofisticada y dinámica interrelación entre los distintos componentes del sistema operado por American Express, y determinar si la práctica constituye una actividad financiera para efectos del pago de las correspondientes patentes municipales.

En términos generales, estamos ante "un documento que permite a su titular obtener bienes o servicios sin tener que hacer su pago inmediatamente. Su funcionamiento puede resumirse de la siguiente forma: La entidad emisora, banco u otro tipo de sociedad, después de estudiar cada caso concreto, envía la tarjeta a su titular que mediante su presentación puede adquirir bienes o servicios en determinados establecimientos, limitándose a firmar la factura que le presenta el comerciante. [É]ste remite dicha factura a la entidad emisora, que le abona su importe [o un por ciento del mismo]. El cliente, por su parte, paga a fin de mes o más tarde". Gómez Mendoza, *Consideraciones generales en torno a las tarjetas de crédito*, en *Homenaje a Joaquín Garrigues*, Madrid, Ed. Tecnos, 1971, T. II, pág. 91.

La tarjeta de crédito cumple con varias funciones económicas: sirve como instrumento de pago, en la medida que permite a los usuarios sustituir el pago en metálico al adquirir bienes y servicios; funciona como instrumento de garantía de pago al comerciante siempre que éste cumpla con las condiciones contractuales y, finalmente, mediante la tarjeta el consumidor obtiene crédito de la entidad emisora que varía de acuerdo a la relación contractual y a la reglamentación del Estado. Íbid., págs. 393–394. En otras palabras, las tarjetas funcionan como evidencia de una promesa de pago futuro. En esta medida se asemejan a las

cartas de crédito y a los instrumentos negociables. *Santiago v. Sears Roebuck*, supra, págs. 520–521; R.J. Nordstron, *Law of Sales*, Minnesota, West Pub. Co., 1970, págs. 345–346; B. Clark, *The Law of Bank Deposits, Collections and Credit Cards*, 2da ed. rev., Boston, Ed. Warren, Gorham and Lamont, 1981, págs. 9–12.

A igual conclusión llegan diversos tratadistas. Simpson, en su libro *Money, Banking and Economic Analysis*, Prentice-Hall, 1976, pág. 26, analiza el funcionamiento de las tarjetas de crédito y concluye:

> Cuando una persona usa su tarjeta de crédito para comprar un artículo promete tácitamente pagar el precio de compra (más interés, si así se especifica) en alguna fecha o fechas futuras. La tienda por departamentos, compañía de gasolina, o el banco, concede un préstamo en términos prearreglados. Luego en la fecha de pago, el tarjetahabiente repaga el préstamo ya sea en efectivo o mediante cheque. (Traducción nuestra.)

Esta característica fue expresamente reconocida en *Santiago v. Sears Roebuck*, supra, pág. 519:

> La tarjeta de crédito se ha convertido de hecho en un nuevo tipo de moneda, moneda de circulación restringida pero que también requiere sólidas reservas de otro género. Como la responsabilidad de crear y mantener estas reservas recae en este caso en los usuarios o consumidores y no en el Estado, el perfil que presenta la nueva institución tiene rasgos familiares. Estamos simplemente ante una nueva técnica para invertir y facilitar un antiguo uso: las compras a crédito.

Véanse, también, J. Bonet Correa, *Comentarios al Código Civil y Compilaciones Forales*, Madrid, Ed. Rev. Der. Privado, 1980, T. XVI, Vol. 1, págs. 150–152; Rivera, *Introducción a la Moneda y la Banca*, Río Piedras, Ed. Universitaria, 1975, pág. 33; Cole, *Consumer and Commercial Credit Management*, 6ta ed., Illinois, Richard D. Irwin, Inc., 1980,

págs. 5–6; *Financial Handbook* (Bogen & Shipman, eds. 4ta ed., Nueva York, John Wiley & Sons.

La entidad que emite un instrumento que sirve de medio de pago está efectuando una actividad financiera similar a la de los bancos:

> Todas las tarjetas de crédito, así como el efectivo y los cheques, son formas de pago. . . . En el mejor de los casos, entonces, American Express es un Competidor con el Sistema de Reserva Federal y los banqueros comerciales de la nación al proporcionar los medios de intercambio. (Traducción nuestra.) G. O'Driscoll, Jr., *The American Express Case: Public Good or Monopoly?*, 19 J.L. & Econ. 163, 165 (1976). Véase *Bank Credit Cards—Problems Under Regulation Z and Possible Problems as a Result of Future Developments Under Proposed Consumer Legislation*, 27 Bus. Law. 111, 117 (1971).

Como la actividad financiera por excelencia, la concesión de crédito permite la adquisición de bienes y servicios a cambio de una promesa de pagar posteriormente. Al adquirir un artículo mediante crédito el consumidor incurre en una deuda que se compromete a pagar en otro momento. Los tratadistas de las ciencias económicas y financieras definen la relación como la habilidad para pagar, "o la habilidad para obtener título sobre artículos y para recibir éstos para el disfrute presente de los mismos, aunque el pago esté diferido a una fecha futura. Por lo tanto, consiste de la transferencia y entrega de los artículos a cambio de la promesa de pagar por ellos en el futuro". (Traducción nuestra.) G. Munn, *Encyclopedia of Banking and Finance*, 8va ed., Boston, Ed. The Bankers Pub. Co., 1962, pág. 167. Véase, también, E.L. Kohler, *A Dictionary for Accountants*, 5ta ed., Nueva Jersey, Ed. Prentice-Hall, 1975, pág. 148. En el *Credit Control Act*, crédito se define como "el derecho otorgado por un acreedor a un deudor de diferir el pago de la deuda o de incurrir en

deuda y diferir su pago". (Traducción nuestra.) Ley Pública 91–151 (12 U.S.C sec. 1901(e)). Para otras definiciones similares véanse: *Truth in Lending Act*, 15 U.S.C. sec. 1602(f), y *Uniform Consumer Credit Code, Unif. Adoption Act* Sec. 1.301(16), 7A U.L.A. 52 (1985).

A los fines de precisar el marco decisorio de esta operación, procede un cuidadoso examen del servicio de tarjeta de American Express.

## IV

En primer lugar, de los autos se desprende que esta actividad constituye el negocio principal de la empresa en el municipio impositor. En su mecánica interna la tarjeta de American Express opera de acuerdo con los términos de tres contratos distintos, pero simultáneos e interdependientes. A estos efectos American Express tiene contratos con sus usuarios, con los establecimientos que permiten el uso de su tarjeta y con una subsidiaria conocida como American Express Credit Corporation (CREDCO).

Todo cargo queda evidenciado en un recibo de cobro que el establecimiento le vende a American Express usualmente por 4% o 5% menos que el costo original de la venta.[6] A su vez American Express vende los recibos a su subsidiaria (CREDCO) a un precio mayor que el costo de adquisición del establecimiento. La venta dispone de todos los derechos que tiene American Express en los recibos y los transfiere en su totalidad a CREDCO. La venta se efectúa sin derecho a repetir (*without recourse*) contra American Express por cualquier deficiencia que surja del incumplimiento de pago por el usuario de la tarjeta. Toda pérdida que pueda resultar de la falta de pago por el usuario es única y exclusivamente asu-

---

[6] El descuento constituye un cargo por "servicio" que varía dependiendo del volumen de negocio de establecimiento participante.

mida por CREDCO. Bajo los términos del contrato entre American Express y CREDCO, el único deber de la primera en cuanto a los recibos una vez hecha su venta es el de facturación. Además del beneficio que recibe como resultado de la venta de los recibos de cobro, American Express recibe una suma por encargarse de la facturación y cobro de los mismos.

American Express también ofrece a sus usuarios un mecanismo de pagos diferidos. El uso de dicho mecanismo se limita a la compra de pasajes de avión, barco u otros medios de transportación. Estos pagos son hechos a plazo e incluyen un cargo por interés de 18% anual. Al igual que en el caso de los otros cargos, los recibos son comprados por American Express y vendidos a CREDCO, entidad que se beneficia del cobro de intereses.

El sofisticado esquema sugiere que la tarjeta de American Express constituye un medio de financiamiento de consumo de amplia repercusión económica utilizado por consumidores a través de todo el país. Reiteramos que su utilidad es similar a la de una carta de crédito expedida por un banco y aceptada por miles de establecimientos comerciales a través de todo el mundo. Para el establecimiento constituye una garantía aún más confiable que la del cheque de cuenta corriente bancaria.[7] El recibo que acredita el importe de la

---

[7] Al examinarse y estudiarse el funcionamiento de las tarjetas de crédito desde la perspectiva del comerciante, se ha dicho que guarda una gran similitud con el financiamiento de cuentas por cobrar conocido por *factoring*. Véase *Bldg. Maintenance Serv. v. H.R. Exec. Bldg.*, 109 D.P.R. 656, 659 (1980). Véanse, además, *The Tripartite Credit Card Transaction: A Legal Infant*, 48 Calif. L. Rev. 459, 468–469 (1960); J.G. South, *Credit Cards: A Premier*, 23 Bus. Law. 327, 329 (1968); Boulliane, *Factoring—a Financing Alternative for Clients*, Journal of Accountancy, Dec. 1980, pág. 24; K.M. Landey, *Consumer-Cardholder Defenses in Tripartite Credit Card Arrangements: A Battleground for the Beleaguered Bank*, 88 Comm. L.J. 84, 95 (1983). Por tal razón, se considera que los planes de tarjetas de crédito funcionan como unos medios de financiamiento para los co-

transacción tiene un valor monetario y se vende entre las entidades corporativas de esta empresa multinacional con la misma facilidad que cualquier instrumento negociable o pagaré que certifique una cuenta por cobrar.

El acuerdo entre el usuario y la empresa conlleva que American Express le extienda crédito a un comprador para que pueda adquirir bienes o servicios de otras empresas. A su vez, el consumidor se compromete a pagar por el dinero adelantado en un término de treinta (30) días. De no efectuar el usuario el pago correspondiente dentro de dicho período, la empresa puede imponer un cargo de 1% mensual sobre el balance de la deuda.

Por el servicio ofrecido la empresa obtiene un beneficio equivalente a la diferencia entre el precio pagado por el usuario y el costo real de los recibos que American Express compra a los comercios participantes. En efecto, el consumidor, al saldar la deuda mensualmente, paga por el uso del crédito un cargo que varía de acuerdo al establecimiento. Independientemente de su nombre, esta transacción es de tipo financiero.

Así también concluyó el Tribunal Supremo de Estados Unidos al resolver una controversia sobre el alcance del *Truth in Lending Act*:

> Así pues una compañía de tarjetas de crédito como American Express concede crédito a un individuo u organización cuando estos últimos abren o renuevan una cuenta, así como cuando el tarjetahabiente utiliza la tarjeta de crédito para hacer compras. Cuando la cuenta se abre o renueva, el acreedor ha concedido el derecho "a incurrir en deuda y diferir el pago"; cuando se usa la tarjeta el acreedor le ha permitido al tarjetahabiente "diferir el pago de la deuda". (Traducción

---

merciantes. W.F. Robinson, *New Developments in Retail Financing*, 8 U. Kan. L. Rev. 554, 567–574 (1960).

nuestra.) *American Express Co.* v. *Koerner*, 452 U.S. 233, 241 (1981).

Por último, es equivocada la conclusión del tribunal de instancia de que American Express no realiza una actividad financiera porque los intereses que genera el plan de pagos diferidos son cobrados por una entidad distinta. En este caso, el hecho de quién cobre los intereses sólo es pertinente para propósitos de la determinación de quién tiene que informar esas ganancias como ingresos. Eso, sin embargo, no puede tener el efecto de variar la naturaleza de la transacción efectuada por American Express. Para que ésta pueda vender a CREDCO o alguna otra entidad los contratos que generan intereses, es preciso que los otorgue. Así se desprende del propio contrato (Ap. IV). En la parte introductoria de dicho documento se indica que las palabras "usted" y "de usted" se refieren al usuario de la tarjeta, y las palabras "nosotros" y "nuestro"(8) se refieren a la compañía American Express. Más adelante, en la sección del plan de pagos diferidos, se expresa lo siguiente:

> Usted puede pagar sus compras a lo largo de un período de tiempo si, al hacer su compra, usted elige un plan de pago disponible. Si lo hace, *nosotros* cobraremos un *CARGO POR FINANCIAMIENTO* a la *TASA DE PORCENTAJE ANUAL* de 18% por el período durante el cual deban efectuarse los pagos. (Énfasis suplido y traducción nuestra.)

Según el documento, la recurrida está contratando con el usuario un plan de pagos diferidos que conlleva un cargo por financiamiento. Al entrar en ese tipo de relación,

---

(8) La disposición del contrato lee como sigue:

*"For Extended Payment Plan Only*

"You may pay for purchases over a period of time if you elect an available extended payment plan when making the purchase. If you do we will assess a *FINANCE CHARGE* at an *ANNUAL PERCENTAGE RATE* of 18% for the period during which payments are required to be made." Ap. IV.

American Express está efectuando una actividad financiera. Facilitar y otorgar este tipo de crédito, como parte de un complejo sistema de financiamiento de consumo, es el tipo de actividad financiera que el legislador incluyó en la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651 *et seq.*, al ampliar su alcance en el 1974. Nuestra decisión se limita a reconocer la facultad del Municipio de San Juan de imponer patentes únicamente a la American Express y empresas similares que, por la naturaleza y alcance de los servicios y transacciones de su tarjeta, se dedican en el municipio impositor a una actividad financiera. Por otro lado, esto no significa que el municipio esté facultado para cobrar patentes a CREDCO, corporación que no es parte en este pleito, que no tiene su industria o negocio ni recibe ingresos en el municipio impositor.

Del análisis anterior, concluimos que el negocio de tarjetas de American Express constituye una actividad financiera sujeta al pago de patentes municipales. Por lo tanto, *se dictará sentencia mediante la cual se revoca la sentencia del Tribunal Superior y se deja en vigor la decisión del Municipio de San Juan.*

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita. El Juez Asociado Señor Alonso Alonso se inhibió.