CC-99-325                                                                          1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Royal Bank of Canada<br>        Demandante-Recurrida<br><br>                v.<br><br>Municipio de San Juan<br>        Demandada-Peticionaria | Certiorari<br><br>2001 TSPR 90 |

Número del Caso: CC-1999-325


Fecha: 15/junio/2001


Tribunal de Circuito de Apelaciones:
                                Circuito Regional I


Juez Ponente:
                        Hon. German J. Brau Ramírez


Abogados de la Parte Peticionaria:
                        Lcdo. Cristian Bernaschina Bobadilla
                        Lcdo. José A. Menéndez Cortada


Abogado de la Parte Recurrida:
                        Lcdo. Javier Rivera Longchamps


Materia: Patentes Municipales



        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcciones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Royal Bank of Canada

     Demandante-Recurrida


        vs.                             CC-1999-325        Certiorari

Municipio de San Juan

     Demandada-Peticionaria


Opinión del Tribunal emitida por el Juez Presidente señor Andréu García


San Juan, Puerto Rico, a 15 de junio de 2001

En este caso, la parte peticionaria, el Municipio de San Juan, recurre ante nos de la sentencia emitida por el Tribunal de Circuito de Apelaciones, mediante la cual revoca al Tribunal de Primera Instancia al concluir que bajo la Ley de Patentes Municipales, 21 L.P.R.A. §651a et seq., la parte recurrida, Royal Bank of Canada, no venía obligada a pagar patentes por la cantidad total de intereses reflejados en una partida asociada a los contratos de permuta de tasas de interés ["*Interest Rate Swaps*"]. La

controversia que tenemos que resolver nos requiere determinar si los intereses que alegadamente ingresan como parte de un contrato de permuta de tasa de interés se consideran parte del ingreso bruto utilizado para calcular el volumen de negocios sujeto al pago de patentes municipales.

I.

En el presente caso los hechos pertinentes son los siguientes:

El 8 de mayo de 1996 el Municipio de San Juan le envió a la recurrida Royal Bank of Canada (Royal Bank) una notificación final de deficiencia de patentes municipales, conforme la §16 de la Ley de Patentes Municipales, 21 L.P.R.A. §651o(a)(2), para el año fiscal 1994-95. El 7 de junio de 1996, Royal Bank presentó una demanda judicial para impugnar tal determinación de deficiencia que ascendía a $30,367.41 y se desglosaba en tres partidas de volumen de negocios relacionados con ingresos por concepto de impresión de cheques, por concepto de cancelación temprana de contratos de permuta de tasas de interés y por concepto de contratos de permuta de tasas de interés.

La controversia surge en torno a la partida por concepto de contratos de permuta de tasas de interés. En su jornal general, la parte recurrida tenía una cuenta de gastos por $943,906.00 identificada como costos bajo el acápite "Interest On Swap Due to RBCIMN". Dicha cuenta, según la estipulación de las partes, se compensaba con otra cuenta de ingresos la cual recogía el monto bruto que Royal Bank tenía derecho a recibir por estos contratos. Al compensar esta cuenta de ingresos con la de gastos, el neto era la partida que el Royal Bank estaba reportando y pagando para propósitos de la patente municipal. Dicha partida se computa a base del "notional principal amount" de cada contrato de permuta de tasa de interés que existía durante el periodo de contabilidad, utilizando el interés acordado para cada contrato que el Banco había obtenido para dicho período.

El Municipio entendía que el banco venía obligado a pagar patentes a base de todos los intereses que reflejaban sus libros, no meramente el neto, y procedió a reafirmarse en su notificación de deficiencia. Posteriormente, ambas partes presentaron moción de sentencia sumaria a su favor. Luego de celebrada una vista en la cual las partes argumentaron sus respectivas posiciones, el 6 de julio de 1998, el Tribunal de Primera Instancia emitió una sentencia en la cual declaró con lugar la moción de sentencia sumaria presentada por el Municipio de San Juan. El foro de primera instancia basó su conclusión en que los contratos de permuta de tasas de interés otorgados por el banco debían ser interpretados como "ingreso" a la luz de la Ley de Patentes Municipales. Añadió que analizando la definición de "negocio financiero", y encontrar que no existe una deducción específica que excluya dicho ingreso del volumen de negocios, tal ingreso necesariamente tiene que formar parte del mismo. Señaló que la impugnación de Royal Bank busca una exención contributiva, las cuales se interpretan restrictivamente contra quien las reclama. Para el Tribunal de Primera Instancia, el hecho de ser compensado este ingreso

bruto con un costo de interés en este contrato, no hace diferencia para determinar el volumen de negocios; sostuvo que resolver lo contrario desvirtuaría el propósito e intención de la Ley de Patentes Municipales de definir el volumen de negocios como la totalidad de los ingresos brutos generados por una actividad en particular dentro de cada municipio. En fin, concluyó que la determinación de deficiencia procedía y que Royal Bank debía pagar la cantidad basada en el monto de $943,906.00.

Inconforme con dicha determinación, Royal Bank apeló al Tribunal de Circuito de Apelaciones señalando que el Tribunal de Primera Instancia erró al interpretar que el flujo de fondos por concepto de contratos de permuta de tasas de interés constituía "ingresos" incluidos en la definición de "volumen de negocios" de la Ley de Patentes Municipales. El Tribunal de Circuito de Apelaciones revocó la decisión de instancia al concluir que el banco no recibe los intereses en la partida asociada con los contratos de permuta de tasas de interés, ya que, dada la naturaleza de tales contratos, es el valor neto del contrato lo que constituye el "ingreso bruto" bajo la Ley de Patentes Municipales. Concluyó, por tanto, que Royal Bank no venía obligada a pagar patentes por la cantidad total de intereses, sino sólo por aquellos ingresos que efectivamente recibe bajo dichos contratos.

Así las cosas, el Municipio de San Juan presentó un recurso de certiorari ante nos en el que señala como único error que el Tribunal del Circuito de Apelaciones se equivocó al determinar que el producto total bruto del contrato de permuta de tasas de interés recibido o devengado por Royal Bank en su sucursal del Municipio de San Juan, no está sujeto al pago de patente municipal.

## II.

Es nuestro deber interpretar las leyes y estatutos de modo que prevalezcan sus propósitos legislativos esenciales. Para dilucidar el significado de una ley, estamos obligados a tomar en consideración los fines que persigue de forma tal que la interpretación se ajuste al fundamento racional o fin esencial de la ley y sea conforme a la política pública que la inspira. Lever Brothers Export Co. v. Alcalde de San Juan, 140 D.P.R. 152 (1996); Esso Standard Oil v. A.P.P.R., 95 D.P.R. 772 (1968).

La Asamblea Legislativa expresamente ha autorizado a los municipios del Estado Libre Asociado de Puerto Rico a imponer y cobrar patentes municipales. En diversas ocasiones nos hemos expresado sobre la naturaleza y el alcance del poder tributario de nuestros municipios. Hemos establecido que en Puerto Rico se favorece una interpretación amplia del poder tributario delegado a los municipios. La ley responde a una filosofía que favorece la ampliación de los poderes de los municipios, de forma que éstos puedan proveer más servicios directos a la ciudadanía. Federal Deposit Insurance Corp. v. Municipio de San Juan, 134 D.P.R. 385 (1993); American Express Co. v. Municipio de San Juan, 120 D.P.R. 339 (1988). Por tal razón señalamos en Arecibo Bldg. Corp. v. Mun. de Arecibo, 115 D.P.R. 76,

78 (1984), que "[d]el texto de la ley se desprende que la autoridad concedida a los municipios es amplia. La utilización de las palabras 'toda persona,' 'cualquier servicio,' 'cualquier industria o negocio' no permiten que se le dé una interpretación restrictiva". Esto es así toda vez que las expresiones legislativas continúan fortaleciendo la facultad contributiva de los gobiernos municipales mediante enmiendas a la Ley de Patentes Municipales, supra. Véase c.f., las Exposiciones de Motivos de las siguientes enmiendas a la Ley de Patentes Municipales: Ley Núm. 82 de 30 de agosto de 1991; Ley Núm. 93 de 17 de noviembre de 1992; Ley Núm. 23 de 14 de abril de 1996; Ley Núm. 96 de 24 de junio de 1998. Por lo tanto, en materia de interpretación de exenciones tributarias, es un principio básico que éstas son gracias legislativas que constituyen derogaciones del poder soberano, por lo que no deben extenderse más allá de los términos expresados y exactos del estatuto que las otorga. Lever Export Co. v. Alcalde, supra. Por tales razones hemos establecido además que "[c]uando hay autoridad de la ley para ello y excepto en casos inherentemente sospechosos no estamos inclinados a intervenir con la regulación económica municipal..." Sears Roebuck v. Municipio de San Juan, 122 D.P.R. 26 (1988).

Sin embargo, para poder determinar si es aplicable alguna exención dispuesta por ley, es necesario primero considerar si la ley es aplicable de manera tal que confiera autoridad para imponer la patente. Es además necesario, considerar el aspecto sustantivo de la imposición de la patente, ya que ésta no depende de la clasificación que le hayan dado las partes para fines de contabilidad. En Coca-Cola Co. v. Municipio de Carolina, 136 D.P.R. 216 (1994), esta curia estableció que los dividendos pagados a la compañía en virtud de unas acciones propiedad de ésta no están sujetos al pago de patentes municipales por no ser un ingreso producto de los negocios que la persona, natural o jurídica, desempeña en el municipio. Aquí establecimos que "en nada varía nuestra decisión el que hubiese incluido el dividendo en el estado financiero de las operaciones de Coca-Cola. La facultad municipal de imponer patentes no es documental, sino sustantiva; no depende de que se incluya o no el ingreso en determinado estado financiero."Id.

Considerando este marco general discutiremos la figura del contrato de permuta de tasa de interés para luego establecer cómo se enmarca dicho instrumento dentro de la Ley de Patentes Municipales, supra.

III.

Los contratos de permuta de tasas de interés ["*interest rate swap agreements*," o "IRSA" por sus siglas en inglés] son acuerdos privados entre dos corporaciones para el intercambio futuro de flujos de fondos ["*cash flows*"] de acuerdo a una formula preacordada. John Hull, Options, Futures, and Other Derivative Securities, 2da ed., 1993, en la pág. 111. Solo discutiremos el tipo más común del contrato de permuta de tasa de interés llamado en inglés el "*plain vanilla swap*", ya que como señaló el Tribunal de Circuito de Apelaciones, los contratos de permuta de tasa de interés no obran en el

expediente sino que han sido caracterizados por las partes como instancias típicas de este tipo de instrumento financiero. Por ello, partimos de la premisa que dichos contratos son la instancia más común y más simple de este tipo de contrato.[1]

En el *"plain vanilla interest rate swap"* una Compañía, B, se obliga a pagarle a otra Compañía, A, flujos de fondos equivalentes a un interés predeterminado y <u>fijo</u> sobre una cantidad principal determinada que sirve de base [*"notional principal amount"*] por un número de años. B incurre en dicha obligación a cambio de que A se obligue a pagar un flujo de fondos equivalente a un interés <u>variable</u> sobre la misma cantidad base [*"notional principal amount"*], durante el mismo periodo de tiempo. El plazo de dicho contrato puede ser desde un año hasta quince años. El resultado es que ambas compañías truecan la obligación de A de pagar el <u>interés fijo</u> por la obligación de B de pagar el <u>interés variable</u> y viceversa. Véase, Hull, <u>supra</u>.

Como regla general, los pagos adeudados se efectúan al cierre de cada periodo bajo el cual se calcula el interés variable, o sea el índice utilizado para calcular la tasa de interés. Las partes pueden pactar pagar únicamente la diferencia de lo adeudado, o sea, al final de cada periodo se paga la cantidad resultante de todos los flujos de fondos compensados. H. Peter Nesvold, <u>Interest Rate Swaps: The Taxation of Trading Places</u>, 76 TAXES 25, 27-28 (1998). Las deudas principales no se intercambian porque el valor del principal [*notional principal amount*] es meramente un índice o parámetro sobre el cual se calculan los intereses a trocarse. Por tal razón el valor ideal del principal se mantiene igual para las partes durante la duración del contrato de permuta de tasas de interés independientemente del tipo de interés que hayan trocado. Hull, <u>supra</u>, en la pág. 116.

Este instrumento financiero forma parte de los instrumentos derivativos o valores derivados [*"derivative securities"*] que son instrumentos cuyo valor depende del valor de otras variables o bienes precedentes. Peter Nesvold, <u>supra</u>, en la pág. 25. Este valor derivativo, que se comenzó a negociar en público alrededor del 1981, se otorga exclusivamente entre compañías y es de los que se intercambian en el llamado mercado de valores *"over the counter,"* o sea en instituciones financieras; no se intercambian en una bolsa de valores como el instrumento derivativo más común: las opciones para la compra de acciones [*"stock options"*]. Véase, Hull, <u>supra</u>, en la pág. 1.

Las compañías truecan intereses de un tipo por intereses de otro tipo por múltiples razones. Un IRSA puede funcionar como método de reducción de costos de financiamiento, como operación de cobertura [*"hedging"*] y además, como instrumento de inversión. <u>Procter & Gamble</u> v. <u>Banker's Trust</u>, 925 F. Supp. 1270 (1996). El costo de financiamiento se

---

[1] Aparte del *plain vanilla swap* existen los siguientes tipos de IRSA: *"caps"* (donde el costo de la tasa de interés variable está limitado), *"floors"* (donde la ganancia de la tasa de interés variable está limitada), *"collars"* (es un IRSA con un *cap* y un *floor*—limita el costo y la ganancia producto de la fluctuación del interés variable); se negocian además

reduce como resultado de la negociación de un IRSA, cuando media una ventaja comparativa ["*comparative advantage*"] entre las compañías contratantes. Mediante un ejemplo utilizando el argumento de la ventaja comparativa demostraremos la reducción de los costos de financiamiento resultante.[2]

Digamos que una compañía contratante, A, tiene mejor crédito (ventaja financiera) que la segunda compañía, B, por lo que A puede conseguir un préstamo con una tasa de interés más baja que B en ambos mercados de intereses, el de intereses variables y el de intereses fijos. Por ejemplo, ambas compañías pueden conseguir préstamos por 5 millones de dólares. La compañía A puede conseguir el préstamo a un 10% de interés fijo, mientras que la compañía B lo consigue por un interés fijo de 11.20%. Dentro del mercado de intereses variables, digamos que A puede conseguir el financiamiento de los 5 millones por una tasa del 0.30% sobre algún índice de intereses (como puede ser, entre otros índices, el interés que cobra alguna institución, grupo o asociación de instituciones financieras a sus clientes preferidos, denominado comúnmente como interés primario o "prime rate") mientras que B solo lo puede conseguir con una tasa de 1.00% sobre el mismo índice.

Considerando que la diferencia entre la tasa de interés variable ofrecida a B y la tasa de interés variable ofrecida a A [(índice+1.00%)–(índice+0.30%) = 0.70%] es <u>menor</u> que la diferencia entre los intereses fijos ofrecidos a estas dos compañías [11.20% –10.0% = 1.20%], A toma el préstamo del acreedor principal que le sería más costoso a B conseguir al comparar la ventaja que tiene A sobre B. A base de este ejemplo, el más costoso para B es el tipo de interés fijo, por ser mayor la diferencia entre las tasas ofrecidas a ambas compañías. Por lo tanto, A tiene una mayor ventaja comparativa dentro del mercado de intereses fijos, mientras que B está <u>en menor desventaja</u> comparativa dentro del mercado variable. Al fijar el intercambio entre las partes,[3] el beneficio económico potencial total para las partes contratantes (o sea la cantidad total de reducción de los costos

---

*swaptions* (opciones de compra de un IRSA), entre otros. Véase, Michael T. Cartusciello, <u>Coping with IRS Guidance on Notional Principal Contracts</u>, 72 J. Tax'n 24, 26 (1990).

[2] El ejemplo que explicamos a continuación ha sido tomado de John Hull, <u>Options, Futures, and Other Derivative Securities</u>, en las págs. 111–116.

[3] El intercambio referido sería el siguiente: A tiene un préstamo de $5 millones al 10.0% (fijo) con banco X. B tiene con otro banco, Y, un préstamo de $5 millones con tasa de interés variable del 1.00% más el índice escogido. A y B pactan trocar intereses, A paga el índice variable, B paga el 9.95%. Como tal tenemos que:
--A **paga** el interés del 10.0% al banco X (su propia obligación original),
--A **recibe** de B el 9.95% por concepto de interés fijo trocado, y a cambio de tal derecho,
--A **paga** a B el monto del índice utilizado para fijar el interés variable.
Por otro lado,
--B **paga** el interés de su obligación original al banco Y equivalente al 1.00% más (+) el índice,
--B **recibe** de A la cuantía del índice.
--B **paga** a A el 9.95% del interés fijo pactado.
Por lo tanto,
--A tiene como salida por los tres flujos de fondos, el 0.05% (diferencia del interés fijo pagado y el recibido) más la cuantía del índice. En otras palabras, A paga como resultado del IRSA el índice + 0.05%, cantidad que es menor que la tasa de (0.30% + índice) que hubiere pagado de haber A acudido directamente al mercado de intereses variables.

de financiamiento entre las dos partes) es siempre la diferencia entre la tasa de interés que pueden conseguir ambas compañías en el mercado de intereses fijos menos la diferencia en la tasa de interés que pueden conseguir las compañías en el mercado de intereses variables [1.20% – 0.70% = 0.50%].

En segundo lugar, este instrumento se puede utilizar como operación de cobertura ["*hedging*"].[4] Las operaciones de cobertura son estrategias utilizadas para reducir los riesgos asociados con las industrias y con los movimientos del mercado. El propósito de una operación de cobertura es tornar certero el resultado de alguna inversión o de algún negocio.[5] En este caso, el "*plain vanilla swap*", funciona como mecanismo de protección contra las fluctuaciones de los intereses, en los casos donde las compañías pactan tasas de intereses variables, pero no desean cargar con el riesgo envuelto. Por otro lado y como tercer propósito, las partes que desean especular sobre los movimientos del mercado participan en estos contratos de permuta de tasas de interés como si negociaren o invirtieran en cualesquiera otros valores. Peter Nesvold, <u>supra</u>, en las págs. 26–27.

Como regla general, las partes contratantes ["*end users*"] en este tipo de contrato no se ponen de acuerdo directamente la una con la otra, <u>sino que utilizan un intermediario financiero tal como un banco</u>. Véase, Henry T.C. Hu, <u>Swaps, The Modern Process of Financial Innovation and the Vulnerability of a Regulatory Paradigm</u>, 138 U.Penn. L.Rev. 333, 354–363 (1989). <u>Esto significa que la ganancia potencial total se divide entre tres partes y no dos</u>. Lo que sucede en estos casos es que la institución financiera, o sea la intermediaria, carga con dos contratos separados, uno con la compañía A y otro con la compañía B. La intermediaria ejerce múltiples funciones: es un "casamentero" o promotor de dichos contratos, un fiador de las partes en casos de incumplimiento y además, es un "gurú" o monitor conocedor de los cambios del mercado. <u>Id</u>., en la pág. 355.

La información y el conocimiento especializado del intermediario le otorgan una ventaja en la localización de contrapartes adecuadas. Además, este conocimiento especializado le permite explotar las posibilidades de arbitraje ["*arbitrage*"] inherentes a los IRSA. <u>Id</u>.[6] Por otro lado, la necesidad de la intervención de un fiador emana de la desconfianza que la falta de conocimiento de la identidad de su contraparte

---

––B tiene como salida, por los tres flujos de fondos, un total de 10.95% de interés fijo. O sea, 0.25% menos que lo que pagaría de acudir directamente al mercado de intereses fijos (en el cual le daban una tasa de 11.20%). Véase, Hull, <u>supra</u>, en las págs. 113–114.

[4] Véase, Mathew Calhoun Frost, <u>Treatment of Interest Rate Swaps Under the SEC's Net Capital Rule: A Proposal for Change</u>, 37 WM & MARY L.REV. 791, 800–802.

[5] Véase, BARRON'S DICTIONARY OF BUSINESS TERMS 263 (1st ed. 1987) define un "*hedge*" como "*a strategy used to offset business or investment risk*." Para algunos, el "*hedge*" perfecto es el que elimina <u>toda</u> posibilidad de ganancia, o de pérdida, futura. Hull, en la pág. 13.

[6] REAL ACADEMIA ESPAÑOLA, DICCIONARIO DE LA LENGUA ESPAÑOLA 126 (1992), define arbitraje, en su acepción comercial, como una "[o]peración de cambio de valores mercantiles, en la que se busca la ganancia aprovechando la diferencia de precios entre unas plazas y otras." Véanse además, HULL, <u>supra</u>, en las págs.13–14 ["*arbitrage involves locking in a riskless profit by simultaneously entering into transactions in two or more markets*." Ejemplo: comprar a un precio más bajo un valor que es equivalente a otro valor que se vende más caro, como

genera en cada una de éstas.  Por tal razón, la institución financiera se compromete al cumplimiento específico de los términos del contrato en caso de incumplimiento por una de las compañías. Id. Véase además, Hull, supra, en las págs. 114-115.

Demostraremos las funciones del intermediario utilizando el ejemplo anterior de las compañías A y B.  Digamos que un banco intermediario, Z, decide que las compañías A y B son las adecuadas para trocar sus intereses.  Sin embargo, la compañía A no va a querer contratar con B por desconocer el historial de crédito de ésta.  Aquí banco Z, en su función de casamentero y fiador, efectúa dos contratos de permuta de tasas de interés.  Primero contrata con la compañía A, donde A le paga a Z el índice variable sobre el cual se fija la cuantía de la tasa de interés, mientras Z le paga el 9.9% en concepto de tasa fija de interés.  El banco Z, por otro lado, contrata con la compañía B un "mirror swap", esto es, un contrato de permuta de tasa de interés con los mismos términos del contrato con A, pero donde el banco Z toma la posición de A.  En este segundo contrato, entonces, quedamos con que Z le paga a B el índice variable de interés, mientras B le paga a Z el índice fijo de 10%.  Por lo tanto, el banco Z recibe y paga la misma tasa variable, mientras que por concepto de la tasa fija recibe un 0.10% por encima de la tasa fija que paga.

En el ejemplo anterior, el banco Z ha logrado un "mirror swap" ideal porque las necesidades de una y otra parte se complementan adecuadamente y resultan en una operación de cobertura perfecta, que elimina para el banco todo el riesgo asociado con las fluctuaciones de los intereses.  El banco tendrá un ingreso fijo de 0.10%, independientemente de los cambios de tasa en el índice fijado.  Sin embargo, la intervención del banco en este instrumento no está enteramente libre de riesgos ya que como fiador del instrumento, se mantiene sujeto a la responsabilidad por incumplimiento de alguna de las partes.

Además, es improbable que dos compañías que deseen trocar sus intereses se comuniquen simultáneamente con un banco intermediario.  Como regla general, las grandes instituciones financieras que se dedican al intercambio "over the counter" de estos valores derivativos están capacitadas para almacenar y retener [warehouse] estos instrumentos.  En este contexto, la retención de los IRSA consiste en negociar con una compañía un IRSA y luego efectuar alguna operación de cobertura para eliminar el riesgo asociado con la tasa de interés, hasta que se encuentre una compañía contraparte. Hull, supra, en la pág. 118.

En fin, tenemos que en el contrato de permuta de tasa de interés intervienen tres partes, siendo el eje en la figura el banco intermediario.  Aunque las cuentas de un banco intermediario reflejan la entrada y salida de cuatro flujos de fondos, tales fondos no se devengan por el banco. Mas bien, el banco los recibe con la intención de traspasarlos

---

comprar acciones en la bolsa de NY a $172.00, cuando en la bolsa de Londres se venden a

a las partes y solamente retiene la diferencia entre la entrada y salida de dos de los flujos de fondos (los calculados en concepto de interés fijo). Por lo tanto, el ingreso del banco en este caso es la diferencia retenida únicamente, que se justifica entre las partes como una especie de comisión por los desempeños del banco.

IV.

Conforme al señalamiento del Municipio de San Juan, el Tribunal de Circuito de Apelaciones erró al concluir que el monto bruto del contrato de permuta de tasa de interés recibido o devengado por el Royal Bank no está sujeto al pago de patente municipal. No le asiste la razón.

La Ley de Patentes Municipales, supra, en la §651d(a) autoriza a los Municipios cobrar a cualquier negocio financiero hasta el 1.50% de su volumen de negocios atribuibles a operaciones llevadas a cabo en el municipio que imponga la patente autorizada, excepto cuando la propia ley disponga lo contrario. La sección 651a define las frases "negocio financiero" y "volumen de negocios" de la siguiente manera:

"[...]

(6) **Negocio financiero**. Significa **toda industria o negocio consistente en servicios y transacciones de bancos comerciales**, asociaciones de ahorro y préstamos, bancos mutualistas o de ahorros, compañías de financiamiento, compañías de seguro, compañías de inversión, casas de corretaje, agencias de cobro y cualquier otra actividad de naturaleza similar llevada a cabo por cualquier industria o negocio. El término "negocio financiero" no incluirá actividades relacionadas con la inversión por una persona de sus propios fondos, cuando dicha inversión no constituya la actividad principal del negocio.
(7) **Volumen de negocios.**
    (A) **Regla general.**
        (i) **Volumen de negocios**. Significa los **ingresos brutos** que se reciben o se devenguen por la prestación de cualquier servicio, por la venta de cualquier bien, o por cualquier otra industria o negocio en el municipio donde la casa principal realiza sus operaciones, o los ingresos brutos que se reciban o se devenguen por la casa principal en el municipio donde ésta mantenga oficinas, almacenes, sucursales, [...].
        (ii) **Ingresos brutos**. Significa la totalidad de los ingresos de fuentes dentro y fuera de Puerto Rico que sean atribuibles a la operación que se lleva a cabo en cada municipio, excluyendo todos los ingresos, tales como interés y dividendos provenientes de la inversión por un individuo de sus propios fondos, [...].
    (B) <u>**Negocio financiero**</u>. Cuando se trate de negocio financiero, el **"volumen de negocios" será el <u>ingreso bruto recibido o devengado excluyendo</u>**:
        (i) El costo de la propiedad vendida, esto es, excluyendo el costo de los bienes inmuebles y el de los bienes muebles vendidos por el negocio financiero, los cuales puede consistir, entre otros valores, acciones y bonos.
        (ii) Los reembolsos de anticipos, préstamos y créditos concedidos, pero sin que la suma deducida por estos conceptos exceda el principal de dichos anticipos, préstamos o créditos.
        (iii) Los depósitos.
        (iv) Las pérdidas incurridas en cualquier operación sobre valores, pero sin que la deducción que se haga por ese concepto exceda del total de las ganancias obtenidas por dichos valores.
    En el <u>**caso específico de bancos comerciales**</u>, asociaciones de ahorro y préstamos y bancos mutualistas o de ahorro, **el ingreso bruto significará los intereses recibidos o devengados de préstamos**, los **cargos por servicios prestados**, las rentas, el **beneficio bruto en la venta de propiedades o valores** y las **ganancias, beneficios e ingresos derivados de cualquier otra procedencia** dentro y fuera de Puerto Rico atribuibles a la operación en Puerto Rico.
    El ingreso bruto devengado por estas organizaciones sujeto al pago de patentes se distribuirá entre las sucursales de acuerdo con la proporción que guarden todas las clases de depósitos de la sucursal con los depósitos totales de la organización en Puerto Rico. [...]" 21 L.P.R.A.§651a [Énfasis nuestro].

---

100 libras y el cambio está a $1.75 por libra]; Calhoun Frost, <u>supra</u>, en las págs. 800-802.

Se desprende claramente de la propia ley que para sujetar a un negocio en particular al pago de patente municipal, es necesaria la concurrencia de dos criterios. El primero exige que la empresa o negocio sea un negocio financiero dedicado con fines de lucro a 'servicios y transacciones' en el municipio correspondiente. Segundo, "es necesario que se determine la base sobre la cual se impondrá la patente." Lever Brothers Export Co. v. Alcalde de San Juan, supra. Específicamente la ley señala que deberá imponerse la responsabilidad tributaria sobre el volumen de negocios atribuible a la prestación de algún servicio, la industria o el negocio que se lleve a cabo en el municipio; esto es, siempre que no sean aplicables algunas de las exenciones de la ley. Id.

En el caso ante nos estamos ante la situación de un negocio financiero, según definido por la §651a(a)(6), antes citada. Dada la situación especial del negocio financiero, el "volumen de negocios" de dicha industria no se define bajo la regla general dispuesta en la §651a(7)(A), sino por la regla del inciso (B) de la §651a(7). Tal inciso (7)(B) define "volumen de negocios" e "ingreso bruto" ampliamente, o sea incluye todo ingreso bruto excepto la lista taxativa que hace en los incisos (7)(B)(i) al (iv).

Sin embargo en el penúltimo párrafo de tal inciso (7)(B), la Ley señala el caso especial de los bancos comerciales. Aquí establece afirmativamente que el ingreso bruto significará (1) los intereses recibidos o devengados de préstamos, (2)los cargos por servicios prestados, (3) las rentas, (4) el beneficio bruto en la venta de propiedades o valores y (5) las ganancias, beneficios e ingresos derivados de cualquier otra procedencia. La letra de la ley es amplia, ya que permite sujetar al pago de patente municipal "las ganancias, beneficios e ingresos derivados de cualquier ... procedencia".

En este caso, los flujos de fondos basados en los intereses que caracterizan los contratos de permuta de tasas de interés no se pueden considerar "intereses recibidos o devengados" de préstamos ya que el banco recurrido, en las concepciones 'comunes' de dicho contrato, no es el banco prestamista. Además, según concluyó correctamente el Tribunal de Circuito de Apelaciones, los intereses no son recibidos ni devengados como tal, sino que funcionan como un parámetro para computar los pagos que deberán hacer las partes. Mas aún, la constitución de dicho instrumento derivativo tampoco se puede considerar una venta, por lo que tampoco se calcula basado en el beneficio bruto de la venta de valores.

Por tal razón, concluimos que al incluir en el caso especial de los bancos comerciales "las ganancias, beneficios e ingresos derivados de cualquier otra procedencia", la legislatura intentó autorizar la imposición de la patente sobre el presente valor derivativo de acuerdo al beneficio que recibe el banco. En otras palabras, el beneficio devengado una vez trocados los intereses, cuando el instrumento queda constituido como tal. Nuestra conclusión queda inalterada por el hecho de que Royal Bank contabilizara las cuantías entrantes y las salientes por separado, ya que como mencionamos anteriormente, la imposición

de patentes "no es documental, sino sustantiva; no depende de que se incluya o no el ingreso en determinado estado financiero". _Coca-Cola Co._ v. _Mun. Carolina_, supra.

Por todo lo antes expuesto, se dictará sentencia confirmando la decisión del Tribunal de Circuito de Apelaciones.

José A. Andréu García
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Royal Bank of Canada

    Demandante-Recurrida


      vs.                      CC-1999-325       Certiorari

Municipio de San Juan

    Demandada-Peticionaria


SENTENCIA


San Juan, Puerto Rico, a 15 de junio de 2001


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta sentencia confirmando la sentencia dictada por el Tribunal de Circuito de Apelaciones.

Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señores Corrada del Río y Rivera Pérez no intervinieron.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo